Good morning. I'd like to reserve two minutes of time if possible for rebuttal argument. Try to keep your voice up. I'd like to reserve two minutes of time if possible for rebuttal argument. My name is Eric Rossman. I'm an attorney in Boise, Idaho, and I represent the appellant in this case, in the Armstrong v. United States case. This case is on appeal to the Ninth Circuit Court of Appeals following the granting of a motion to dismiss under Federal Rule Civil Procedure 12B1 for lack of subject matter jurisdiction. The central issue is the application of the discretionary function exception to the plaintiff's claims under the Federal Tort Claims Act. In addressing the application of the discretionary function exception to the Federal Tort Claims Act, this Court held in Young v. United States that whether a challenged action falls within the exception requires a particularized analysis of the specific agency action challenged. The allegations of how the government is alleged to have been negligent is critical. The specific issue in this case is whether the identification and the taking of some action relating to the hazard tree in this case, in the campground in this case, was required under what was called the Third Pole Project in 2005. If not, if it was not mandatory, was any discretion associated with those decisions the kind that was intended to be protected by the exception itself? The standard of review is obviously de novo on a dismissal. And the plaintiff, although the plaintiff and the appellant bears the burden of proving subject matter jurisdiction, I would emphasize that the burden is on the government to prove the application of the exception itself. Because the FTCA is intended to compensate individuals, its provisions should be construed liberally and its exceptions construed narrowly. And that was decided by this Court in Turbush, 516 F. 3rd, 1135. You don't have to read the law to us. We do know the law. What do you point to in this record as being the language, the thing that requires this action by the government? So I would submit that there are two steps. First was whether or not the inspection of this particular campsite was required under the Third Pole Project, under the Berkovits analysis. I think you're restating the law again. What is that first step? What is the thing you're pointing to? So Third Pole Project required, and I think it's undisputed. Well, I understand. I mean, that's a big reference. You might as well be referring to the United States Code saying, well, somewhere, what specifically? Give me language. Give me a specific site. So the inventory sheet that is in the record, the specific inventory sheet, has a section as part of the inventory, the obligation to inspect for human safety concerns, and specifically for hazard trees. It required the identification of hazard trees in the inspection report. Does the record tell us what happened in instances where hazard trees were identified? It does not. And you didn't find anything one way or the other? I didn't find anything. I did not find anything one way or the other, Your Honor. And I would also emphasize that a hazard tree is a fairly general description. A hazard tree can range from something that has some potential likelihood of failure to something that has imminent risk of failure within a year, which is what was considered, which is what, undisputedly, this tree was considered in this particular case. But after the fact? After the fact, however, each of the individuals with expertise that testified in this case, plaintiff's expert, Dr. Donato from the government, and also Mr. Guyon from the government, they all admitted that as of 2010, that tree more likely than not had been standing dead for over 10 years. Yeah, although, you know, there's a lot of snags that stand for 20, 30, 40 years. The fact that it had been there for 10 years doesn't tell me much. But there might have been other things about that particular tree, of course, that would have made it very likely to fail. And, of course, it did. Right. And in the record with Dr. Donato's testimony and also Mr. Guyon's testimony and also plaintiff's expert's testimony, a standing dead tree is, in fact, identified per se as a tree with imminent risk of failure. Isn't the real problem here that policy doesn't specifically require remediation of hazard trees? It just seems to require identification? That's the distinction, I guess, between this case and the Ferguson case where there was both the mandate that you remove the trees. I would submit to the court that the government has placed no policy consideration whatsoever into the record under these particularized facts that would have justified doing nothing under the second prong of Berkwood's analysis. Specifically, if we look at the particular action in this case, and that is a standing dead tree that's been dead for at least five years at the time of the inspection. Imminent risk of failure in a campsite that is known to the government in their own documentation to have regular camping. In fact, there's reference in the government's own record that there's camping at that site virtually every weekend of the summer. So you've got a tree with imminent risk of failure hazard within feet of people camping every weekend. And it's not an obvious known risk, as the court's addressed in the Blackburn case. It's a risk that only the United States Forest Service is obligated to identify. And in this particular case... I'm sorry, but once again, obligated by what? The Third Pole Project. If you look at that inventory... What does it say? What does it say you've got to identify and advise? What does it say there? So the inventory sheet was enacted as part of the project, and it was given to the individuals that go around to these campsites and inspect them. And it has all the items that they're obligated to inspect for. One of those items is human safety concerns. And one of the specific human safety concerns that they were obligated to inspect for were hazard trees. And there's no evidence in the record to dispute that. Linda Bryan, who actually did the inspection, testified that she was expected to inspect for hazard trees. And when she inspects for hazard trees, at ER 36, pages 3523 through 369, she testified about all the detailed steps that she was expected to go through. Her boss, T.J. Clifford, testified that she was expected to use reasonable care in inspecting these campsites. The individual, the ranger that actually adopted this policy, Ranger Erickson, testified in his deposition at page ER 83 that reasonable care was expected of these individuals when inspecting these campsites. So she had the obligation to inspect the campsite for a hazard tree. And she's admitted, as well as the other deponents in the record, have admitted that when you inspect a campsite, you have to use reasonable care to identify hazard trees. And when you're identifying a hazard tree, you're obligated to... Where on 36 are you reading? 3523 through 369. She goes through the steps that she goes through when inspecting a particular site for hazard trees. Well, that is what she does. I'm just trying to figure out where it is that it says she's required to do this. So where it says she's required to do it is in the inspection form, where it says she's obligated to identify hazard trees. Where is that? It's... Unfortunately, I don't have the site to the inspection form itself. I could identify that and bring it to the Court's attention on rebuttal, certainly. Was this a developed campsite or something more rugged and less developed? Well, it was a developed campsite. It was not a developed campsite as identified by the government. However, it was a campsite that the government knew was frequently visited virtually every weekend of the summer. There was a fire ring there. Pardon me? There was a fire ring there. Yeah, there was a fire ring there, and they knew that people were congregating in that area along that stream virtually every weekend of the summer. Is there a difference for purposes of the policy to identify hazard trees, whether the campsite is a developed one or not? I think there would be if but for the Third Pole Project, Your Honor. Without the Third Pole Project, all that is required by the Forest Service manual is the inspection of developed campsites. But the Third Pole Project took it out of the manual and said we are going to inspect dispersed campsites, these specific dispersed campsites, which included the one in this case. Is there any development in the policy of the reasons for identifying hazard trees, or is it just obvious to everybody?  If you look through, it wasn't the primary purpose of the Third Pole Project, but it was a purpose of the Third Pole Project, and that was a human safety consideration and identification of hazard trees. You're down to less than a minute. Do you want to say anything? Yes, Your Honor. Thank you. We'll hear from the government. Good morning, Your Honors. Janie Lilly for the United States. Plaintiffs challenge, plaintiffs' claims directly challenge the Forest Service policy for how to manage the general forest area as opposed to the developed campsites that the Forest Service channels recreational users to. His argument is that, in fact, that policy decision was made and that there is a requirement under the project that these campsites be inspected. That's his argument. He's arguing that the Third Pole Project, which was an environmental study of watershed quality in the wilderness, the general forest area of the Boise National Forest, converted the Forest Service policies about recreation in the general forest area in a way that it hasn't. If you turn to the actual inventory at ER 156 and 157, you'll see that there are 30 characteristics that in particular. Before we get to that, I do want to go there. If the Third Pole Project, in fact, required what opposing counsel says it does, would you agree that that is no longer a discretionary decision at that point? It depends, Your Honor, I think, on what it is that what aspect you're asking me to assume. Let's say it said you have to inspect these campsites for hazards to human habitation. Let's say it said that. I realize it doesn't quite say that, so I do want to look at what it says. But let's say it has such a requirement. Would you agree? I'm not trying to put words in your mouth. I'm just trying to understand your position. Would you agree that that is no longer a discretionary function issue? The Third Pole Project required the government to inspect campsites and prescribe the specific types of conduct to inspect. And then I think that the part that would be missing there still is that we find no duty to remediate or to take any action with respect to those trees. As Your Honor pointed out, not in the Third Pole Project. Even looking specifically at the inventory here. Okay, well, why don't we look at that? So the inventory sheet is on page 8. 156 and 157. And then you can see the compilation of results at 158 and 159, where you can see that the purpose of this was part of a precursor to a NEPA study about how to improve certain areas in the forest, the watershed quality, and the bull trout, the ecology for the bull trout population. So here the government, the inventory sheet requires Linda Bryant in this case, the Forest Service employee who went out, to catalog various characteristics of how humans are using the general forest areas that might impact the water quality, one of which is, you know, the existence of a user-created fire ring, and to catalog how humans are using this, one of which is this item 31, described as human safety. And it describes, it requires her to categorize according to a category, whether there are no human safety hazards, whether there are any hazard trees at all. And then you'll see on the following page, she's just required to identify according to a category, one, two, or three, whether there are any human safety characteristics that are noted or not. So in some instances she noted the existence of hazard trees, in other instances, including this campsite, five years prior to the accident, she noted no hazard trees. I have trouble understanding why the existence of a hazard tree is relevant to the stated purpose of the project. And, Your Honor, that goes, I think, to the purpose of the project was to assess human impact on the forest area. This is the impact of forest area on humans. That's certainly how it is described, that human safety might be one way of reading it. But if you read the testimony of Linda Bryant and her supervisors, it was clear that the purpose of the project, the instructions on ER 317, on those who are conducting the project, were to measure the direct effects of human activities on riparian function. Well, she may think that, but she could be wrong. If she's wrong about that, then maybe the government would be liable. So you're telling us that she thinks she doesn't have to do this doesn't really answer Judge Fletcher's question. Do you remember Judge Fletcher's question? Yes, Your Honor. It's why it would be described as human safety characteristics. What does that have to do with a NEPA plan? Or the stated purpose of the project, which apparently is to assess the impact of human behavior upon, I guess, water quality. Your Honor, the record is unclear why it would be labeled human safety characteristics. But the record is very clear on the precise purpose of the project. And I'm directing you not to her understanding, but to the instructions from the Forest Service to those conducting the surveys, which were to address and evaluate activities and impacts that have direct effects on riparian function. Well, let's say this thing said, it doesn't say it quite so explicitly, but let's say it actually said, you know, when it says here, 31, human safety, it says you should inspect for human safety to avoid hazards to campus. Let's say it said that. Yes, Your Honor. And she said and the Forest Service said, well, we look at the purpose of the project and human safety has nothing to do with it, so we don't take that into account. We'd be entitled to say they're wrong, right? We could look at it and say, well, you're wrong about that because it's very clear, that's what it says here, right? It would be very strange indeed for the Forest Service to have done that. I mean, given the purpose of the project, given the policies. Well, you haven't been around as long as I have, but I've seen a number of strange things done by the government. Yes, Your Honor. So, you know, brace yourself for a long career of seeing strange things. This is not one of those strange things. That is not a good answer. So try the next answer. Well, Your Honor, it stands to reason. The Forest Service did not alter its policy. Assume my question to be, assume the facts to be as my question implies. We look at this, and contrary to all expectations and to what you would guess, it actually has something in here that says, look out for hazards to campus. And the Forest Service looks at it and says, well, it can't, you know, no, we don't read it that way. We read it to mean something else. Right. We did not adopt that policy. Okay. We'd be entitled to look at this and say, no, they're wrong, and we can read this as an actual requirement under the Federal Tort Claims Act, right? The fact that the Forest Service doesn't see it that way doesn't bind us, right? Well, Your Honor, the question is whether this is susceptible. No, no, you answer my question. Yes, Your Honor. The question before you, Your Honor, is whether this is. I don't need you to tell me what my job is. I have asked you a specific question. Yes. You want to answer it? Yes, I'd like to answer it. Okay, so you remember what the question is? Yes, Your Honor. Okay, so just answer that question. Can you read this to adopt a policy? No, you're not hearing the question. Let's say we do read it that way. Yes, Your Honor. We are entitled to second-guess and say the Forest Service is wrong about how it reads this. That's precisely the point of the discretionary function exception, Your Honor, is not to second-guess the policy. If we view this as mandatory. Yes, Your Honor. If we read this as mandatory. Yes. That's a question of law. Yes, Your Honor. And then we can tell the Forest Service it's mandatory. It's not discretionary, right? Your Honor. There's no Chevron deference we owe or anything of that sort, is there? Well, Your Honor, if you were to read these two words in a 30-item inventory to radically change the Forest Service's policy with respect to how it manages the forest and recreational opportunities, you would still not have a mandatory duty. You would not have been able to identify in these two words a mandatory duty to remediate the tree in any specific way. And there, Your Honor, despite how you read a duty to inspect or inventory in a NEPA-related survey of an area in the forest that is used by recreational visitors to the forest, there's no duty to remediate the particular tree. Let me focus on the deference question that I asked you. Yes, Your Honor. In deciding what the thing says, do we owe any deference to the agency? And if so, what kind of deference? Is it Chevron? Is it Mead? Help me out, Professor. What are the other deferences? I forget. They're going to be gone very soon, all of them. Oh, yes. I understand that. But so far, they exist. Anyway, there's a whole series of deferences we owe. Do we owe any kind of deference to the interpretation here? To the government's interpretation of the inventory form. Your Honor, we have not argued that in our brief, but it would stand to reason that the court could take the government's word for whether or not it adopted a mandatory duty in this inventory sheet to identify or remediate trees in a particular way. This is a tort defendant in this case. It's not acting in its regulatory capacity. So this is not a situation where we're reviewing a regulation under the APA or NEPA or, you know, whatever. We're, you know, this is a defendant. And we don't usually take a defendant's word for what, we don't usually give deference to a defendant in a tort case as to what its duty is, right? Well, Your Honor, here we're not, we haven't developed this for the purposes of litigation. This is an inventory that was developed for the purposes of a NEPA-related study. We're not seeking any sort of unusual, we're not asking the court to make any unusual leaps about the meaning of this inventory study. It's the plaintiffs who have done so here in trying to bootstrap two lines in this 30-person, 30-item inventory into a radical change in the Forest Services policy. Ms. Bryant did not identify this hazard when she surveyed the campsite. If she had, would that have made a difference in this case? Your Honor, five years, if she had identified this as a hazard tree five years beforehand, no, Your Honor, I don't think so because there would have been no mandatory duty at that time, much less five years later, to take any particular action. Are there other projects in which clearly a hazard must be identified and remediated with the language as clear or not? In the third pole project or? In any other project in the Forest Service. I'm not sure that I could speak universally to projects. I'm just wondering whether there are other projects that specifically say hazards must be remediated because this policy doesn't say that. You're right, Your Honor. This policy does not, and there's examples in this Court's case law where a government agency has adopted a specific safety plan or undertaken a specific safety plan. I think that was a softball question, and you should be answering they're developed campsites for which the Forest Service has radically different standards for remediation of safety hazards. Yes, Your Honor. There are those policies in developed campsites, Your Honor. And for roads. And for roads, yes. Those policies exist, and those create different responsibilities and policies towards those trees. Let me get it from a slightly different angle. Your Honor. When campers go to these campsites that are not the standard campsites, are they told that this is not unexpected? Is there any kind of warning? Yes. Are there any posted signs? Are they given paperwork? Yes, Your Honor. To answer your question directly, there is evidence in the district court record, not in the excerpts of record here, about the types of warnings that are given in maps. The Heifel Declaration that is in the excerpts of record before this Court explains the type of safety warnings, in-person to person warnings when they're encountered, general safety warnings on the website or on maps that would be available to those who are camping in the general forest. What do those warnings say specific to this hazard? I think those are along the lines of, I don't have them in front of me, but know before you go that trees can create safety issues and to be aware of your surroundings at all times. They don't say that we don't inspect those campsites for human hazards. Your Honor, the reason that they don't is because these are I'm sorry. It sounded like a statement. I was actually asking a question. Yes. There's nothing in the record saying that the government warns people. If you're going to these out-of-the-way campsites, you're doing it at your own hazard. We haven't inspected them. No, Your Honor. And if I can take issue a little bit with the premise of the question, these aren't campsites. These are areas where users have been permitted to go into the general forest areas and have maybe repeatedly returned to, but they're not campsites within the meaning of developed campsites that the Forest Service maintains and monitors recreational uses. So this is akin to going out into the general forest area and pitching a tent. This happens to be at the edge of the forest where users have gone before, but there is no sort of general warning about an absence of a duty to inspect all 2.2 million acres in the Boise National Forest. Okay. All right. I think you're out of time. Thank you. We'll round you up to a minute. No, there's no obligation to inspect the rest of the forest, but there was an obligation to inspect this particular campsite through the Third Pole Project. That obligation included human safety inspection, including hazard tree inspection. T.J. Clifford, Linda Bryant's supervisor, testified in his deposition that he expected that during the 2005 survey, Ms. Bryant would assess trees to determine whether they were an imminent risk of falling, and that is at ER 116, page 109, line 21 through 24. She was expected to not just look at the campsite, but to identify hazard trees, and in doing so – Let me ask you this. She's out there inspecting campsites that are not – I'm not quite sure what the Forest Service term is for it, but the Forest Service has developed campsites. The Forest Service itself has developed. Then there are these dispersed campsites, of which this is an example, where users do it themselves, and the fire ring here was not put in by the Forest Service. It was put in by somebody else. How was it determined what campsites of this dispersed nature would be inspected? Was it well known to the Forest Service that there were 100 of these and these would all be inspected? Were they just wandering through the forest thinking, well, people come here sometimes? I mean, how was that determination made? The Third Pole Project was determined by the ranger, Erickson, and he decided that there would be specific dispersed campsites all resting along this – I think it's the Three Mile Creek or Tamarack Falls area. So there was a limited number of dispersed campsites, of which this campsite was – and they were all along the water, which ties to the project of the impact upon the water. Sure, and someone made the determination that if you're inspecting these campsites, we want you looking for human safety issues, especially in this campsite where we know people congregate every weekend of the year. Why isn't it possible to look at this, maybe even likely to look at this? Well, as long as you're inspecting them for various purposes having to do with human impact, why don't we just do a general inventory so we see what we've got? And one of those things is part of the inventory, so we see what we're dealing with is, well, let's see if there are any safety hazards. We're not at this time deciding what we're going to do about them, but we're just doing an inventory. As long as we're out there inspecting, let's do it. Why shouldn't we read the record that way? Because it is a motion to dismiss. In fact, it should be construed in favor of the nonmoving party. There is a factual dispute on that particular issue as to what the scope of their obligation was in inspecting these. And, in fact, some of their own testimony supports a plaintiff's position in this particular case. And if you look at the particular action, which the Corton-Young case said you need to really look at in deciding this exception, the particular action is if she uses reasonable care, identifies this as an imminent risk tree of 27-inch diameter sitting in the middle of a campsite of heavy regular use, doing nothing, the government has identified no policy consideration that would support doing nothing under the second Berkowitz analysis. Thank you. Thank you.
judges: Kozinski, W. Fletcher, Tunheim